UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON

CARLYE N. ASHMORE,

      Plaintiff,                      Case No. 3:20-cv-499

vs.

OHIO DEPARTMENT OF              District Judge Michael J. Newman
TRANSPORTATION,

      Defendant.

---

## ORDER: (1) GRANTING DEFENDANT'S SECOND MOTION FOR SUMMARY JUDGMENT (Doc. No. 37); AND (2) TERMINATING THIS CASE ON THE DOCKET

---

Plaintiff Carlye N. Ashmore ("Ashmore") alleges that her former employer, Defendant Ohio Department of Transportation ("ODOT"), created a hostile work environment and retaliated against her in violation of Title VII of the Civil Rights Act ("Title VII"), 42 U.S.C. § 2000e, *et seq*. This civil case is before the Court on ODOT's second motion for summary judgment.[1] Doc. No. 37. Ashmore responded (Doc. No. 38) and ODOT replied (Doc. No. 39). Thus, the motion is ripe for review.

## I.      BACKGROUND

### A. ODOT

ODOT is an Ohio state agency "responsible for designing, building, and maintaining Ohio highways." Doc. No. 37-1 at PageID 424. ODOT has 12 district offices throughout the state and

---

[1] The Court previously denied without prejudice ODOT's first motion for summary judgment and directed the parties to conduct further discovery. Doc. No. 33. The parties thereafter advised the assigned Magistrate Judge that they did not foresee the need for additional discovery. Doc. No. 34. ODOT then filed its second dispositive motion for the Court's consideration. Doc. No. 37. That motion includes one additional affidavit. Doc. No. 37-8.

at least one garage in each county. *Id.* ODOT has approximately 4,933 permanent employees in the state; of that total number, 364 permanent employees work in District 7 and 20 work in Shelby County. *Id.* at PageID 425.

"ODOT employees are subject to the terms and conditions of employment as specified by the Ohio Revised Code for exempt employees and the Collective Bargaining Agreement ("CBA") for bargaining-unit employees." *Id.* According to Article 6.01(A) of the CBA, all newly-hired employees are subject to a probationary period of 365 days. *Id.* at PageID 430. The probationary period may be extended if management and the union mutually agree. *Id.* Additionally, ODOT "has the sole discretion to discipline or discharge probationary employee(s) and any such probationary action shall not be appealable through any grievance or appeal procedure" of the CBA or the State Personnel Board of Review. *Id.* at PageID 424, 431.

ODOT's Anti-Discrimination, Anti-Harassment (including Sexual Harassment), Anti-Retaliation Policy ("Policy No. 36-001(P)") defines hostile work environment harassment as "when an individual is subjected to unwelcome conduct based on his/her membership in a protected class, where the conduct is severe or pervasive enough to create a work environment that a reasonable person would consider intimidating, hostile, or abusive." *Id.* at PageID 472. The policy further states that retaliation occurs when an employee is "engaged in a protected activity[;] . . . the employer knew or should have known that the individual engaged in a protected activity; the individual was subjected to an adverse employment action; and, there is a causal connection between engaging in the protected activity and the adverse employment action." *Id.* at PageID 473. The policy defines retaliatory harassment as when

> a co-worker harasses a colleague after becoming aware that he/she
> filed a complaint where a co-worker's conduct is sufficiently severe
> as to dissuade a reasonable worker from making or supporting a
> charge of discrimination; supervisors or members of management
> know or should have known about the co-worker's conduct; and, the
> supervisors or members of management have condoned, tolerated,
> or encouraged the conduct, or have responded to the complainant so
> inadequately that the response manifests indifference or
> unreasonableness under the circumstances.

*Id.* "Sex/Gender" is a protected category under this policy. *Id.* at PageID 475. A supervisory or management employee who learns of any conduct that potentially violates this policy must immediately report the conduct to his or her supervisor or ODOT's Office of Equal Opportunity. *Id.* at PageID 477.

### B. Ashmore's Employment at ODOT

Ashmore began working for ODOT in 2018, first in ODOT's apprentice program as a highway maintenance worker in Allen County (from July 23, 2018 until December 7, 2018), then as a seasonal Highway Technician 1 ("HT1") in Allen County (from December 8, 2018 until March 2, 2019), and, last, as a full-time probationary HT1 in District 7 in Shelby County (from March 3, 2019 until January 7, 2020). *Id.* at PageID 425, 429, 478, 480-81; *see also* Doc. No. 25 at PageID 91.

Ashmore, as an HT1, was responsible for "flagging, litter pickup, mowing, pulling weeds, [] snow and ice removal[,]" driving dump trucks, and "mills and fills" (*i.e.*, removing and replacing asphalt). Doc. No. 37-1 at PageID 425; Doc. No. 25 at PageID 91. As relevant to the present case, she worked with: Kenneth Pickering ("Pickering"), HT1; Rodney Ferguson ("Ferguson"), HT1; Jeffrey Covault ("Covault"), HT1; Zachary Hamblin ("Hamblin"), HT1; Frederick Harper ("Harper"), Highway Technician Equipment Specialist; Robert Rogers[2] ("Rogers"), HT2; Patrick

---

[2] ODOT's list of employees includes a "Richard Roger." Doc. No. 37-1 at PageID 425. Because the investigation documents specifically list "Robert Rogers," including a document that the employee signed,

Craft ("Craft"), HT2; and Kimberly Wilson ("Wilson"), Highway Technician 3 Maintenance ("HT3M"). Doc. No. 37-1 at PageID 425; Doc. No. 37-2 at PageID 488, 517. Wilson made shift assignments but "none of these individuals, including Wilson, had authority to affect any material changes in [Ashmore's] employment status, such as hiring[,] firing, promotion, reassignment with significantly different responsibilities, or in relation to salary or employment benefits." Doc. No. 37-1 at PageID 425. At Shelby County, Ashmore's supervisors were Tony Brown ("Brown") and Jeff Marshall ("Marshall") and, if neither were present, Dave Drees. Doc. No. 25 at PageID 91; Doc. No. 37-1 at PageID 479.

Ashmore temporarily transferred to the Dayton, Ohio area in approximately June 2019 to help with tornado cleanup. Doc. No. 25 at PageID 98, 100, 102. She worked with ODOT employees from various counties while there. *Id.* at PageID 98.

Ashmore asserts that before she left for tornado cleanup, the atmosphere at the Shelby County Garage was good, no one she knew argued, and if there were arguments, she stayed out of them. *Id.* at PageID 100. Ashmore says she had no interpersonal conflicts, though there were incidents she wanted to report but felt she could not to avoid "making waves." *Id.* Ashmore alleges that a union representative and workers in Allen County told her that ODOT will get rid of probationary employees who report anything or make waves. *Id.* at PageID 99. She also says she had no problems with Wilson prior to June 2019. *Id.* at PageID 105. Ashmore says the culture changed when she returned from tornado cleanup in June 2019. *Id.* at PageID 98.

## C. Incidents of Harassment

Ashmore testified at her deposition that while she worked for ODOT at Shelby County from March 3, 2019 until January 7, 2020, she was harassed several times, including:

---

*see* Doc. No. 37-2 at PageID 488, 517, and no other document references a "Richard Roger," the Court interprets "Richard Roger" as a typo.

- Brown told Ashmore, on an unknown date, that when he told Wilson that they hired Ashmore, Wilson responded that she "wasn't happy they hired another female." Doc. No. 25 at PageID 96, 98.

- Sometime before June 2019, a male ODOT worker from Logan County found Ashmore on Facebook and wrote to her that "someone doesn't start at ODOT that looks like [her] and not everybody notice and everybody know." *Id.* at 101. Ashmore told Brown about the message and then deleted it. *Id.* Ashmore says that Marshall and Brown knew generally about Ashmore receiving Facebook messages and "it became a big joke in the garage." *Id.* at 100.

- Mike Lindeman, who worked on special projects in District 7, sent between five to ten messages. He usually asked what she was doing. She sometimes responded, explaining that once he invited her to a party at his house and she declined. Then, he sent a "picture of a girl with masks covering her private areas, and he said I found you a new outfit[,]" and Ashmore blocked him. *Id.* at 100-02.

- An ODOT worker from Montgomery County tried to friend Ashmore on Facebook and then "hoot and hollered" at her when Ashmore walked by during tornado cleanup. She did not report this to the supervisor she had while on tornado cleanup, but told her Shelby County supervisor about it when she returned to Shelby County. *Id.* at 101-02.

- Ferguson[3] commented on the color of Ashmore's underwear. *Id.* at 94. "[I]t was usually a weekly comment." *Id.* at 95. Ashmore did not timely report these comments to anyone. *Id.*

- In 2019, while both were doing litter cleanup, Ferguson told Ashmore he was going to f-ck her and "that if [she] got breast implants that he wanted to suck on her boobs."[4] *Id.* at PageID 95. Ashmore did not report this to anyone when it occurred. *Id.*

- Also in 2019, Ferguson told Ashmore that he wanted to have sex with her. *Id.* at PageID 97. She did not report this to anyone. *Id.*

- In May 2019, while on a project in Mercer County, Harper came up behind Ashmore and grabbed her buttocks. Matt Longfellow witnessed the incident. Ashmore did not report it to anyone. *Id.* at PageID 97.

---

[3] Ashmore's deposition sometimes refers to a Rodney Fraser. Doc. No. 25 at PageID 94-95. The Court believes this is a typo based on the employee list (Doc. No. 37-1 at PageID 425), but the name issue does not affect the Court's analysis.

[4] The Court does not wish to offend anyone with the use of inappropriate slang or expletives. However, the Court uses this language throughout this Order in direct quotes from depositions to accurately describe important aspects of this case.

- In a conversation with an unnamed individual, the individual asked Ashmore why she got the easy jobs. Ashmore responded that she didn't know. The individual began laughing. Ashmore then asked, "[D]o you think I get easy jobs because I'm a woman [and] because I have boobs? *Id.* at PageID 95. Ashmore told Pickering about the interaction. Ashmore later learned from the results of the investigation, *see infra* Section I.F., that Pickering told everyone at the garage that she got easy jobs because she is a woman and has breasts. *Id.* at PageID 95-96.

- Covault and Ashmore were picking up litter on the side of a highway when a semi went by and honked. Ashmore said they were honking at Covault and he responded that they were honking at Ashmore. Later, Ashmore overheard Covault tell Wilson that Ashmore said "they only honk at me because of my boobs and my butt." *Id.* at PageID 96.

- Ferguson, to justify why trucks honk at Ashmore, said "it must be her tits or [her] ass." *Id.* at PageID 109.

- Ashmore leaned over a guard rail to tighten some bolts and Craft commented that she "should not do that because she would cause accidents on the roadway from people staring at her 'ass.'" Doc. No. 1 at PageID 3. Wilson and another person named Eric were present for this interaction, but Ashmore did not report it to anyone. Doc. No. 25 at PageID 96.

- While in Dayton working on tornado cleanup in June 2019, Hamblin asked Ashmore if her breasts "were real and what color of underwear [she] had on." *Id.* at PageID 94, 98. Ashmore says that Harper, Rogers, and a person named Casey were present for that interaction; she told the head crew member, Charles Walters, the HT3; and she did not report to anyone else at the time. *Id.* at PageID 94. She later reported this during the investigation into her own conduct. Doc. No. 37-2 at PageID 495; *see infra* Section I.F.

- On June 17, 2019, Wilson "started being hostile and harassing [Ashmore] at work." Doc No. 25 at PageID 94.

- When Ashmore returned from tornado cleanup, other employees refused to speak with her. She believes this is because she is female. *Id.* at PageID 98. Fellow employees told Ashmore while she worked on tornado cleanup that she "needs to watch out for Kim. Because [Ashmore] was getting a lot of male attention and [Wilson] wouldn't like that." *Id.*

- When Ashmore returned from tornado cleanup, Wilson "did not want to be around [her], [and] she didn't want to communicate with [her]." *Id.* at PageID 102. Ashmore believes this is because she is "competen[t.]" *Id.* Ashmore reported this to Marshall and Brown. *Id.* Ashmore also repeatedly told Brown between June and September 2019 that she wanted to leave because of "the way [Wilson] acted and treated [her]." *Id.* at PageID 108.

6

- At some point during the investigation, *see infra* Section I.F., Ashmore told Marshall that Wilson would not speak with her.  Marshall pulled both women aside to talk with them and Wilson said, "what did you go and report now you [f-cking] baby."  *Id.* at PageID 112.  Wilson repeatedly called Ashmore "a [f-cking] baby[,]" accused her of crying, and said she did not want to work with Ashmore.  *Id.* at PageID 112.

### D.  Argument Between Ashmore and Wilson

On October 12, 2019, Craft died.  Doc. No. 26 at PageID 165.  Wilson and several other Shelby County employees organized a memorial service at the Shelby County Garage the following weekend, outside of work hours.  *Id.* at PageID 166.  Four Shelby County employees were not invited to the memorial service: Ashmore, Pickering, Covault, and Olivia Ellafritz.  *Id.* at PageID 166-67.

Ashmore learned, when everyone returned to work, about the memorial service and that she had not been invited.  Doc. No. 25 at PageID 103.  She went to Marshall's office and reported that she was unhappy she wasn't included.  *Id.*  Wilson learned about this and decided to make a statement in front of most Shelby County staff in the breakroom on October 16, 2019.  Doc. No. 26 at PageID 167-68; Doc. No. 26-1 at PageID 197.

After Wilson made the statement, Ashmore responded, and the two began arguing.  Doc. No. 25-1 at PageID 148; Doc. No. 26-1 at PageID 197.  Wilson called Ashmore a liar and a narcissist.  Doc. No. 25-1 at PageID 149; Doc. No. 26-1 at PageID 197.  Wilson then said she had been keeping a journal—an electronic notes file with employees' allegations against Ashmore, including names, dates, and times (Doc. No. 26 at PageID 171)—of Ashmore's conduct and was "trying to keep it in house, but if it doesn't stop [she's] going downtown."  Doc. No. 26-1 at PageID 197.  Ashmore then said she would go down to the district office to report the issues.  Doc. No. 25-1 at PageID 149.  Ultimately, Marshall intervened and ended the argument.  *Id.*; Doc. No. 25 at PageID 103; Doc. No. 26-1 at PageID 203.

### E. Reporting

Ashmore went to Jane Meier-Platfoot ("Meier-Platfoot"), ODOT District 7 Labor Relations Officer 2, on October 16, 2019 and reported her argument and ongoing tension with Wilson. Doc. No. 25 at PageID 104; Doc. No. 37-1 at PageID 424, 426. Ashmore did not indicate at this meeting that any tension was due to sex or gender. Doc. No. 37-1 at PageID 426. Meier-Platfoot told Ashmore to write a statement about her issues. Doc. No. 25 at PageID 104. In that statement, Ashmore wrote that since returning from tornado cleanup, Wilson has treated her differently: acting rudely, telling lies, giving Ashmore bad jobs, and getting others in the garage to avoid her. Doc. No. 25-1 at PageID 148-49. Ashmore also wrote about not getting invited to the memorial service and about the argument in the breakroom. Doc. No. 25-1 at PageID 148-49.

After speaking with Ashmore on October 16, 2019, Meier-Platfoot questioned Wilson. Doc. No. 37-1 at PageID 427; Doc. No. 26 at PageID 171. According to Wilson, she told Meier-Platfoot about the breakroom argument and that she felt Ashmore was picking on her by running to management. Doc. No. 26 at PageID 171. Wilson provided Meier-Platfoot with her own statement of facts regarding the argument. Doc. No. 26-1 at PageID 197. Wilson asserts that, at this meeting, she only spoke of her issues with Ashmore and subsequently shared her journal with Meier-Platfoot. Doc. No. 26 at PageID 171. Meier-Platfoot states in her declaration that at her initial meeting with Wilson, Wilson raised other employees' reports of Ashmore's inappropriate conduct, including comments about her buttocks, claims that she "got this job because of [her] tits[,]" and that she grabbed her breasts provocatively. Doc. No. 37-1 at PageID 426. Pickering, Covault, and Ferguson allegedly witnessed Ashmore's inappropriate comments and behavior. *Id.* at 426-27.

Ultimately, Brown issued a written reprimand to Wilson, stating that she violated the ODOT policy against "insolence – rude or disrespectful conduct[,]" and added it to her personnel file. Doc. No. 26-1 at PageID 198. Also, Wilson and Ashmore were allegedly kept apart. Doc. No. 25 at PageID 109; Doc. No. 37-2 at PageID 495. Finally, ODOT initiated an investigation into the reports of Ashmore's behavior. Doc. No. 37-2 at PageID 482.

### F. Investigation and Termination

Based on the information that Wilson provided to Meier-Platfoot regarding Ashmore's alleged inappropriate behavior, Meier-Platfoot reported Ashmore's alleged behavior to Robin Fogt, ODOT's Affirmative Action Officer and Title VII Program Manager. Doc. No. 37-1 at PageID 427. Robin Fogt then directed Tiffany Cerana ("Cerana"), ODOT's Equal Employment Opportunity Investigator, to investigate Wilson's allegations about Ashmore's sexually inappropriate comments and behavior. Doc. No. 37-2 at PageID 482. During the investigation, Ashmore alleged: Hamblin "asked if my boobs were real. . . . Then [he] asked what color my underwear were." *Id.* at PageID 495. Cerana then expanded her investigation into that allegation as well. *Id.* at PageID 483.

Cerana stated in her declaration that she interviewed Pickering, Covault, Hamblin, Thomas Driskell, Rogers, Ferguson, Harper, Lindsey Koeller, and Ashmore. *Id.* Covault said he "overheard and saw [Ashmore] grab her breasts and sa[y] 'these [f-ckers] are real!'" *Id.* at PageID 498. Ferguson said he was working with Ashmore along the interstate once and a truck drove by and honked, and Ashmore said, "it must be my tits or my ass." *Id.* at PageID 503. He also mentioned that Ashmore once said, "I got this job because of my tits." *Id.* Hamblin relayed a time that Ashmore jumped out of her truck, went up to people, shook her buttocks, and grabbed her

breasts. *Id.* at PageID 506. Pickering recalled another employee ask Ashmore why she gets easy jobs and Ashmore responded by saying: "Because I have boobs." *Id.* at PageID 515.

Ashmore denied making any of these statements or engaging in any inappropriate behavior. *Id.* at PageID 491, 495. Ashmore alleged that Hamblin asked if her breasts were real and asked for the color of her underwear. *Id.* at PageID 495. She said that Harper and Rogers could corroborate this, but neither did. *Id.* at PageID 495, 509, 518-19. Hamblin, during his interview, denied asking either question. *Id.* at PageID 506-07.

Ashmore told Cerana that other employees made up the allegations about her because she reported Wilson's misconduct. *Id.* at PageID 495. Ashmore asserted that the garage was retaliating against her by assigning her apprentice-level tasks. *Id.* at PageID 494. Ashmore informed Cerana that everything was fine and there were no problems until she returned from tornado cleanup in June 2019 and Wilson became hostile to her. *Id.* at PageID 494-95. Since then, Ashmore has gone home in tears and eats lunch by herself. *Id.* at 494. Finally, Ashmore claimed that nothing has been done about Wilson's treatment of her; management was just told to keep the two separate. *Id.* at PageID 495.

Cerana concluded that Covault's and Hamblin's specific allegations about Ashmore were not substantiated, but the allegation that Ashmore grabbed her breasts was. *Id.* at PageID 489. She also determined that no individual corroborated Ashmore's allegation against Hamblin. *Id.* Cerana ultimately found that Ashmore violated Policy No. 36-001(P) by grabbing her breasts in a provocative manner. *Id.* at PageID 490. Cerana issued a report of her findings on December 30, 2019. *Id.* at PageID 483.

While Cerana's investigation was still ongoing, Ashmore's probationary period, which was set to end on December 9, 2019, was extended by 180 days to June 6, 2020, after ODOT and the

union agreed and Ashmore consented. Doc. No. 37-1 at PageID 427, 434. After the report was complete, Meier-Platfoot met with the ODOT Labor Relations Administrator, the ODOT Assistant Labor Relations Administrator, and the Deputy Director of District 7. *Id.* at PageID 428. This committee reviewed Cerana's report and decided to recommend to the Director of ODOT "that Ms. Ashmore be given a probationary removal because her performance and conduct were unsatisfactory." *Id.* Pamela Vest-Boratyn, the Assistant Director of Business and Human Resources, reviewed the report and signed the probationary removal letter on behalf of the Director of ODOT. Doc. No. 37-8 at PageID 544-46. On January 7, 2020, Meier-Platfoot gave Ashmore a disciplinary packet that stated her employment was terminated via probationary removal and she offered Ashmore the opportunity to resign in lieu of termination. Doc. No. 37-1 at PageID 428, 478-79. Ashmore resigned on January 7, 2020. *Id.* at PageID 428, 480.

## II.     STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The burden is on the moving party to conclusively show no genuine issue of material fact exists. *Celotex*, 477 U.S. at 323; *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994). The moving party must either point to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials" or show "that the materials cited do not

11

establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." *See* Fed. R. Civ. P. 56(c)(1)(A) and (B); *see also Morris v. Oldham Cnty. Fiscal Ct.*, 201 F.3d 784, 788 (6th Cir. 2000) (stating that the moving party retains the burden of production, but "need not support its motion with affidavits or other similar materials 'negating' the opponent's claim, but need only show that 'there is an absence of evidence to support the non-moving party's case[]'" (citing *Celotex*, 477 U.S. at 323–25)).

The nonmoving party must then point to specific facts in the materials that indicate a genuine issue. *Morris*, 201 F.3d at 788. The Court must believe the evidence of the nonmoving party and view all facts and inferences in the light most favorable to the nonmoving party. *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (citing *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)).

### III.  ANALYSIS

Ashmore raises two claims: (1) hostile work environment in violation of Title VII; and (2) retaliation in violation of Title VII. Doc. No. 1 at PageID 7-9. ODOT moves for summary judgment in its favor as to both claims. Doc. No. 37 at PageID 392.

ODOT is entitled to summary judgment on both claims. Ashmore does not present evidence that the incidents she alleges were severe or pervasive harassment or that ODOT knew or should have known about, and failed to respond to, any alleged harassment. Likewise, she fails to identify anything in the record showing that her employment ended or ODOT fired her based on her gender, rather than an investigation that concluded that Ashmore engaged in misconduct.

### A. Hostile Work Environment Claim

Ashmore first alleges that she suffered harassment, ridicule, and insults based on her sex that interfered with her work performance and created a hostile work environment. Doc. No. 1 at PageID 7-8. Preliminarily, the Court must determine whether Ashmore's claim is based on supervisor or co-worker harassment. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998) (holding that employers can be held vicariously liable for a supervisor creating a hostile work environment); *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 560-61 (6th Cir. 1999) (creating different frameworks for analyzing hostile work environment claims depending on whether the plaintiff alleges supervisor or co-worker harassment). "[A]n employee is a 'supervisor' for purposes of vicarious liability under Title VII if he or she is empowered by the employer to take tangible employment actions against the victim." *Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013). "A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998).

ODOT asserts that Ashmore alleges only co-worker harassment and Ashmore acquiesces to that analysis. Doc. No. 37 at PageID 413; Doc. No. 38 at PageID 590. Additionally, the only employee Ashmore alleges engaged in harassment and had any authority over her is Wilson. *See, e.g.*, Doc. No. 25 at PageID 108. Assuming, *arguendo*, that Ashmore alleges Wilson sexually harassed her, Wilson had authority to create employee shifts but not to hire, fire, or significantly alter any individual's employment. Doc. No. 37-1 at PageID 425; *see also Newton v. Ohio Dep't of Rehab. & Corr.-Toledo Corr. Inst.*, 496 F. App'x 558, 563 (6th Cir. 2012) (finding the alleged harasser was a co-worker because while he was a higher-ranking official, he had no authority over

13

personnel issues or to condition the plaintiff's employment status). Thus, the Court finds that only the co-worker hostile work environment framework applies here.

For a plaintiff to prevail on a Title VII hostile work environment claim for harassment by a co-worker, she must prove:

> (1) she belonged to a protected group, (2) she was subject to unwelcome harassment, (3) the harassment was based on [sex], (4) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment, and (5) the defendant knew or should have known about the harassment and failed to act.

*Waldo v. Consumers Energy Co.*, 726 F.3d 802, 813 (6th Cir. 2013) (alteration in original) (quoting *Williams v. CSX Transp. Co.*, 643 F.3d 502, 511 (6th Cir. 2011)); *see also Williams*, 187 F.3d 553 at 560-61. This analysis is both subjective and objective: the conduct must be objectively hostile, meaning "an environment that a reasonable person would find hostile and abusive[,]" and the victim must "subjectively perceive" it that way. *Williams*, 187 F.3d at 566 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21-22 (1993)).

ODOT concedes that Ashmore is female and, therefore, meets the first *Waldo* prong, but ODOT challenges the other four prongs. *See* Doc. No. 37 at PageID 414. As to whether Ashmore was subject to unwelcome harassment based on sex (*i.e.*, *Waldo* prongs two and three): "[t]he critical issue . . . is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." *Burnett v. Tyco Corp.*, 203 F.3d 980, 982 (6th Cir. 2000) (citing *Oncale v. Sundowner Offshore Servs.*, Inc., 523 U.S. 75, 80 (1998)); *see also Williams*, 187 F.3d at 565 (6th Cir. 1999) ("Any unequal treatment of an employee that would not occur but for the employee's gender may, if sufficiently severe or pervasive under the *Harris* standard, constitute a hostile environment in violation of Title VII") (emphasis deleted).

14

The Court assumes for analytical purposes, without finding, that Ashmore meets her burden of presenting evidence of inappropriate and sex-related comments and behavior from several workers (*i.e.*, *Waldo* prong three). *See, e.g.*, Doc. No. 25 at PageID 95-97. However, even assuming, *arguendo*, that she satisfies these first three *Waldo* prongs, it is genuinely undisputed, as a factual and legal matter, that this alleged harassment was neither severe nor pervasive, and ODOT never knew nor should have known about the alleged harassment in question (*i.e.*, *Waldo* prongs four and five are not satisfied).

### 1. Whether the Harassment Was Severe and Pervasive

Deciding whether the harassment was severe and pervasive requires considering the totality of the circumstances: "even where individual instances of sexual harassment do not on their own create a hostile environment, the accumulated effect of such incidents may result in a Title VII violation." *Williams*, 187 F.3d 553 at 563. "These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23. "'[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to' a hostile work environment." *Rayford v. Ill. Cent. R.R.*, 489 F. App'x 1, 4-5 (6th Cir. 2012) (alteration in original) (quoting *Faragher*, 524 U.S. at 788). This standard is strict enough to "ensure that Title VII does not become a 'general civility code.'" *Faragher*, 524 U.S. at 788 (quoting *Oncale*, 523 U.S. at 80). "Properly applied, they will filter out complaints attacking 'the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing.'" *Id.* (internal citations omitted).

The Court finds that Ashmore's allegations against Wilson, a fellow female employee, cannot be considered amongst the incidences of alleged sexual harassment. *See Oncale*, 523 U.S.

at 80 (stating that sex discrimination may exist if the conduct is not motivated by sexual desire if "for example, [] a female victim is harassed in such sex-specific and derogatory terms by another woman as to make it clear that the harasser is motivated by general hostility to the presence of women in the workplace[]"); *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 464 (6th Cir. 2000) (holding that the sex-based discriminatory conduct was not pervasive or severe even though Plaintiff was subjected to three incidents of physically-invasive conduct and finding that the court could not consider non-sexual conduct that was unconnected to any discrimination on the basis of gender).

In this case, even assuming that Wilson was unhappy when Ashmore started—because there would be another woman in the garage (Doc. No. 25 at PageID 96, 98)—Ashmore had no issues with Wilson from March until June 2019. Examining Ashmore's allegations against Wilson after June 2019, Wilson avoided her, would not speak to her, turned others against her, and called her a baby for crying. *Id.* at PageID 98, 102, 112. While offensive and suggestive of personal dislike, no evidence indicates that Wilson's treatment of Ashmore was based on sex. *See Barnett v. Dep't of Veterans Affs.*, 153 F.3d 338, 342-43 (6th Cir. 1998) (finding that the conflict between employees was based upon personal issues, not a discriminatory bias); *Morris*, 201 F.3d at 791 ("There is no evidence in the record to suggest that any of [an employee's] alleged offensive post-transfer conduct was committed "because of sex." Rather, it seems to have been motivated entirely by his personal displeasure toward [the] plaintiff and the complaints she made[.]").

Removing any allegations against Wilson from the analysis, the Court finds that Ashmore cannot establish a *prima facie* case for a hostile working environment. While Ashmore alleges numerous incidents, these incidents, when viewed in the light most favorable to Ashmore, constitute gender-related jokes and occasional teasing and one single incident in which an

16

employee allegedly grabbed her buttocks.  Viewing "the accumulated effect" of the incidents, *see Williams*, 187 F.3d at 563, the Court finds that this does not amount to a hostile work environment. *See Morris*, 201 F.3d at 790 (finding no hostile work environment because the offensive conduct amounted to teasing, offhand comments, and isolated incidents when the sex-based conduct included several dirty jokes, a sexual advance, a "one-time reference to [the] plaintiff as "Hot Lips[,]" and comments about the plaintiff's outfit); *Burnett*, 203 F.3d at 984–85 ("[U]nder the totality of the circumstances, a single battery coupled with two merely offensive remarks over a six-month period does not create an issue of material fact as to whether the conduct alleged was sufficiently severe to create a hostile work environment"); *but see Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 334 (6th Cir. 2008) (finding that the allegation that the harassment was severe and pervasive was sufficient for a jury to hear because the harassment was continuous: the offender made sexual comments constantly and engaged in inappropriate behavior every time they worked together, often attempted to touch her while working together, and touched his private parts against her).

Ashmore fails to meet her burden of alleging a hostile work environment because she has not presented evidence that the sex-based harassment she alleges was severe or pervasive.  *See Williams*, 187 F.3d at 560 ("Discrimination in this form occurs '[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" (citing *Harris*, 510 U.S. at 21) (alteration in original)); *Rayford*, 489 F. App'x at 5 (finding no hostile work environment where the plaintiff alleged that the incidents sometimes interfered with his ability to focus, but "he was able to work regularly and continuously and perform his job duties[]"). The only claims that Ashmore said interfered with the conditions of her work were the allegations

against Wilson, which were not sexual and cannot be considered when determining whether the harassment based on sex was severe and pervasive. Doc. No. 25 at PageID 108; *see Williams*, 187 F.3d at 560. For all these reasons, the Court finds that Ashmore's allegations about the harassment she endured fail to create a genuine issue of fact sufficient to avoid summary judgment on her sexual harassment claim.

### 2. Whether ODOT Knew or Should Have Known

Assuming, *arguendo*, that one or more of Ashmore's coworkers created a sexually hostile work environment, Ashmore fails to show that ODOT knew or should have known about the behavior and failed to act. *See Hawkins*, 517 F.3d at 338 ("[W]hen coworker harassment is at issue, an employer is not liable for 'mere negligence,' but is liable 'if its response manifests indifference or unreasonableness in light of the facts the employer knew or should have known.'").

Viewing the evidence in a light most favorable to Ashmore, among the incidents that she now raises, Ashmore claims three incidents of sexually inappropriate behavior while employed by ODOT: (1) she received Facebook messages from ODOT employees in other districts (Doc. No. 25 at PageID 100-01); (2) someone hollered at her while she worked on tornado cleanup (*Id.* at 101-02); and (3) Hamblin asked her about her breasts and underwear (Doc. No. 37-2 at PageID 495).

Ashmore personally remedied the first issue by blocking the Facebook message after notifying Brown, her supervisor, about the message. Doc. No. 25 at PageID 101. She did not report the second issue to her tornado-cleanup supervisor when it happened. Instead, weeks later, she reported it to her Shelby County Supervisor. *Id.* at 101-02. Thus, her supervisors did not know about any harassment until after those issues were remedied by her return to work in Shelby County. *See Jackson v. Quanex Corp.*, 191 F.3d 647, 663 (6th Cir. 1999) ("Generally, a response

is adequate if it is reasonably calculated to end the harassment." (internal citations omitted)). Additionally, until the investigation began, these two claims were the only ones of which Ashmore's supervisors knew, and they amount to only offhand comments, not actionable sexual harassment. *See Faragher*, 524 U.S. at 788. "To be actionable, the harassment must consist of more than words that simply have sexual content or connotations. . . . Instead, the workplace must be permeated with 'discriminatory intimidation, ridicule[,] or insult' sufficiently severe or pervasive to alter the conditions of employment." *Hawkins*, 517 F.3d at 333 (internal citations omitted). *See also Powell-Pickett v. A.K. Steel Corp.*, 549 F. App'x 347, 354 (6th Cir. 2013) (holding that the remaining claims that can "constitute sporadic mean conduct but not the severe or pervasive harassment of a hostile work environment[]" (internal citation omitted)).

Turning to the last incident that Ashmore reported during her employment (*i.e.*, Hamblin's one-time comment about her breasts and underwear), she made the allegation during the investigation into her own conduct with other employees. Doc. No. 37-2 at PageID 495. That is the only claim that Ashmore raised to Cerana, who then expanded her investigation to include that allegation. *Id.* at PageID 483. Through Cerana's investigation, ODOT affirmatively and promptly acted upon hearing allegations of sexual harassment. "[A]n employer may be liable for the sexually harassing conduct of its non-supervisory employees if its response to a complaint 'manifests indifference or unreasonableness in light of the facts the employer knew or should have known.'" *Mullins v. Goodyear Tire & Rubber Co.*, 291 F. App'x 744, 750 (6th Cir. 2008) (quoting *Blankenship v. Parke Care Ctrs., Inc.*, 123 F.3d 868, 873 (6th Cir. 1997), *abrogated on other grounds by Faragher*, 524 U.S. at 807, *and Ellerth*, 524 U.S. at 758-59) (citing *Hawkins*, 517 F.3d at 339) (reiterating that, after *Faragher* and *Ellerth,* the *Blankenship* negligence standard remains applicable to cases considering employer liability for co-worker harassment). Cerana's

19

investigation failed to corroborate Ashmore's allegations and, instead, found that Ashmore engaged in misconduct. Doc. No. 37-2 at PageID 489-90. This led to Ashmore's termination. Doc. No. 37-1 at PageID 428, 478-79. While the investigation's conclusion did not benefit Ashmore, there is no evidence that ODOT acted unreasonably in terminating her employment. *See Rayford*, 489 F. App'x at 6 (finding that the employer acted appropriately in investigating alleged supervisor harassment, finding misconduct occurred, implementing a remedy that was ultimately insufficient, and then terminating the individual that it found engaged in misconduct).

Further, the Court cannot find ODOT responsible for the allegations that Ashmore now raises but never raised during her employment at ODOT. *See id.* ("[N]o reasonable juror could find that [the employer] acted indifferently to [the employee's] co-worker complaints, particularly because [the employee] did not report any incidents of co-worker harassment to [the employer].""). Ashmore asserts that ODOT had constructive knowledge of harassment because she was told not to make "any waves in ODOT while on probation[]" (Doc. No. 25 at PageID 99), and because of Wilson's alleged issues with Marshall (Doc. No. 26 at PageID 180). Doc. No. 38 at PageID 591. However, that misstates the legal standard applicable to constructive knowledge. *See Hawkins*, 517 F.3d at 339-40 (holding that a jury could find the employer had constructive knowledge of the harassment because it had knowledge of past acts of harassment *by the same individual*). ODOT did not have constructive knowledge of harassment because ODOT did not have knowledge of any prior harassment by the individuals Ashmore now identifies as her harassers. Moreover, Ashmore's claim—that she was told to avoid making waves—is not persuasive because she also states that she repeatedly spoke to supervisors about problems with Wilson. Doc. No. 26 at PageID 108. Thus, Ashmore's claim fails because she does not raise facts sufficient for a jury to find that

ODOT knew or should have known, and failed to respond to, claims of severe and pervasive sexual harassment.

## B. Retaliation Claim

Ashmore next asserts that ODOT retaliated against her because she reported Hamblin's allegedly inappropriate conduct. Doc. No. 1 at PageID 8. To prove a *prima facie* case of retaliation, Ashmore must prove:

> (1) she engaged in activity protected by Title VII; (2) this exercise of protected rights was known to defendant; (3) defendant thereafter took adverse employment action against the plaintiff, or the plaintiff was subjected to severe or pervasive retaliatory harassment by a supervisor; and (4) there was a causal connection between the protected activity and the adverse employment action or harassment.

*Morris*, 201 F.3d at 792 (6th Cir. 2000) (emphasis deleted). If Ashmore prevails on her *prima facie* case, "the burden of production of evidence shifts to the employer to 'articulate some legitimate, nondiscriminatory reason' for its actions." *Id.* at 792-93 (quoting *Canitia v. Yellow Freight Sys., Inc.*, 903 F.2d 1064, 1066 (6th Cir. 1990)). "The plaintiff, who bears the burden of persuasion throughout the entire process, then must demonstrate 'that the proffered reason was not the true reason for the employment decision.'" *Id.* at 793 (quoting *Canitia*, 903 F.2d at 1066). If the "proffered reason" is not the employer's real reason for its action, it would indicate that it "was merely a pretext for discrimination." *George v. Youngstown State Univ.*, 966 F.3d 446, 459 (6th Cir. 2020) (internal citation omitted); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 804-05 (1973).

### 1. *Prima Facie* Case

ODOT concedes that Ashmore satisfies the first two prongs, *i.e.*, that she engaged in protected activity and ODOT knew she engaged in such activity. Doc. No. 37 at PageID 418. Thus, the Court examines the third prong.

"A materially[-]adverse employment action in the retaliation context consists of any action that 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'"  *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 596 (6th Cir. 2007) (quoting *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)) (finding that the plaintiff met the threshold by showing they were placed on a brief administrative leave and given a ninety-day performance plan).  Ashmore's allegations show she suffered a materially-adverse employment action because her probationary period was extended and then she ultimately resigned in lieu of termination.  Doc. No. 37-1 at PageID 427-28, 434, 478-79; *see Spellman v. Ohio Dep't of Transp.*, 244 F. Supp. 3d 686, 703 (S.D. Ohio 2017) (finding that the plaintiff met the relatively low threshold because of two administrative leaves and one forced psychological evaluation).

Turning to the last prong of Ashmore's *prima facie* case, a causal connection, "a plaintiff must produce sufficient evidence from which an inference could be drawn that the adverse action would not have been taken had the plaintiff not" engaged in protected activity.  *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000) (internal citations omitted).

First examining the extension of Ashmore's probationary period, Cerana was already investigating Ashmore's conduct when she engaged in activity protected by Title VII (reporting employee misconduct to Cerana).  Doc. No. 37-2 at PageID 483.  The extension of the probationary period was necessary for Cerana to complete her investigation.  Doc. No. 37-1 at PageID 427.  Therefore, a jury could reasonably find that Ashmore's probationary period would have been extended even if she had not engaged in activity protected by Title VII.  Looking next at Ashmore's termination, Ashmore was fired based on Cerana's investigation finding that she had engaged in misconduct.  Thus, a jury could reasonably find that ODOT terminated Ashmore's employment

22

due to her misconduct, not her protected activity. Ashmore engaging in protected activity is not necessarily causally connected to either adverse employment action. *See Simpson v. Vanderbilt Univ.*, 359 F. App'x 562, 571 (6th Cir. 2009) (finding that the plaintiff could not establish a causal connection, partially because the defendant was already investigating the conduct that led to the plaintiff's termination when the plaintiff made his complaints).

Alternatively, based on the timing of the events, a jury could reasonably conclude in Ashmore's favor that her protected activity led to her resignation in lieu of termination: Ashmore reported the alleged misconduct on October 25, 2019 (Doc No. 37-2 at PageID 493), her probationary period was extended on December 9, 2019 (Doc. No. 37-1 at PageID 434), and then she resigned on January 7, 2019 (*id.* at PageID 480). *See Asmo v. Keane, Inc.*, 471 F.3d 588, 593 (6th Cir. 2006) ("Temporal proximity can establish a causal connection between the protected activity and the unlawful employment action in the retaliation context." (internal citations omitted)); *Nguyen*, 229 F.3d at 563 ("The burden of establishing a *prima facie* case in a retaliation action is not onerous, but one easily met." (internal citations omitted)). Thus, a jury could reasonably find that Ashmore has established the last prong of a *prima facie* case of retaliation.

## 2. Legitimate, Non-Retaliatory Reason

Because Ashmore established a *prima facie* case, "the burden of production shifts to [ODOT] to identify a legitimate, non-retaliatory reason for [its] action." *Boshaw v. Midland Brewing Co.*, 32 F.4th 598, 605 (6th Cir. 2022). At this stage of the analysis, "[t]he employer need not persuade the court that it was actually motivated by the proffered reasons. [] It is sufficient if the employer raises a genuine issue of fact as to whether or not it [retaliated]." *Cooley v. Carmike Cinemas, Inc.*, 25 F.3d 1325, 1329 (6th Cir. 1994) (citing *West v. Fred Wright Constr. Co.*, 756 F.2d 31, 33 (6th Cir. 1985).

ODOT easily meets this standard. It explained that it extended Ashmore's probationary period because the investigation—into (1) the misconduct employees alleged against her and (2) that she alleged against another employee—was not yet complete. Doc. No. 37-1 at PageID 427. It explained that Ashmore resigned in lieu of termination after the investigation concluded that she had engaged in misconduct. *Id.* at PageID 427-28. These reasons are certainly sufficient to raise a question about whether these adverse employment actions against Ashmore were retaliatory.

### 3. Pretext

Last, Ashmore must show that ODOT's articulated reasons are a pretext for retaliation in at least one of following three ways: "(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's action." *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 530 (6th Cir. 2012) (internal citations omitted). However, "[i]f an employer has an 'honest belief' in the nondiscriminatory basis upon which it has made its employment decision (*i.e.* the adverse action), then the employee will not be able to establish pretext." *Id.* at 530-31 (citing *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir.2001)).

Ashmore denies the other employees' allegations against her and asserts that the Court must assume the allegations against her are untruthful and, therefore, find that the investigation is uncredited. Doc. No. 38 at PageID 592; Doc No. 37-2 at PageID 493-95. Ashmore's allegation is insufficient, and her legal assertion is incorrect. *See Braithwaite v. Timken Co.*, 258 F.3d 488, 493-94 (6th Cir. 2001) ("[T]he plaintiff must allege more than a dispute over the facts upon which his discharge was based. He must put forth evidence which demonstrates that the employer did not 'honestly believe' in the proffered non-discriminatory reason for its adverse employment action." (quoting *Smith v. Chrysler Corp.*, 155 F.3d 799, 806-07 (6th Cir. 1998))). Ashmore has provided

no evidence to support her assertion about ODOT's reasons for her termination. As a result, she has failed to show that ODOT's proffered reasons had no factual basis, did not actually motivate ODOT, or were insufficient to warrant her termination. *See Spellman*, 244 F. Supp. 3d at 705 (finding that the plaintiff failed to provide any tangible evidence to support her claims of pretext).

Meanwhile, ODOT has put forward probative evidence to demonstrate that it honestly believed its non-discriminatory reason for termination. *See supra* Sections I.A., I.F.; *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 526 (6th Cir. 2008) ("To show an honest belief, 'the employer must be able to establish its reasonable reliance on the particularized facts that were before it at the time the decision was made.'" (quoting *Smith*, 155 F.3d at 806-07)). ODOT established that it initiated an investigation into the allegations against Ashmore. Doc. No. 37-2 at PageID 482. ODOT explained that it extended Ashmore's probationary period on December 9, 2019 because the investigation was ongoing. Doc. No. 37-1 at PageID 427. It offered evidence that the investigation concluded on December 30, 2019 and found that Ashmore violated Policy No. 36-001(P). Doc. No. 37-2 at PageID 485. To that end, ODOT provided Policy No. 36-001(P) to the Court. Doc. No. 27-1 at PageID 470-77. ODOT also included its policy regarding probationary periods, which permits ODOT to both extend probationary periods and discharge probationary employees at ODOT's own discretion. *Id.* at PageID 430-31. Finally, ODOT supplied the Court with Ashmore's termination letter and her form agreeing to resign in lieu of termination. *Id.* at PageID 478, 480.

Based on all this unchallenged evidence, the Court finds it undisputed that ODOT reasonably and honestly relied on the facts before it when it decided to extend Ashmore's probationary period and then terminate her employment. *See Chen v. Dow Chem. Co.*, 580 F.3d 394, 401 (6th Cir. 2009) ("When an employer reasonably and honestly relies on particularized

facts in making an employment decision, it is entitled to summary judgment on pretext even if its conclusion is later shown to be 'mistaken, foolish, trivial, or baseless.'" (citing *Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 713-15 (6th Cir. 2007))).  Thus, Ashmore's allegation—that ODOT retaliated against her for engaging in activity protected by Title VII—fails to create a genuine issue of fact sufficient to avoid summary judgment on this claim.

## IV.    CONCLUSION

For the foregoing reasons, the Court **GRANTS** ODOT's motion for summary judgment (Doc. No. 37) and **TERMINATES** this case on the docket.

**IT IS SO ORDERED.**

  October 18, 2023                                     s/Michael J. Newman
                                                       Hon. Michael J. Newman
                                                       United States District Judge